Robert BOOTH, on his own behalf and
on behalf of all others
similarly situated

v.

BOARD OF DIRECTORS OF NATIONAL
AMERICAN BANK, Robert Azar, Harry
Batt, Sr., Bernard Grenrood, William
Kross, Hester Plauche, Louis J. Roussel,
III, Louis Roussel, Jr., Victor Schiro,
Cecil Shilstone, National American
Bank.

Civ. A. No. 75–2457.

United States District Court,
E. D. Louisiana.

Aug. 25, 1979.

As Amended Aug. 30, 1979.

Joseph W. Thomas, New Orleans, La., for plaintiff.

Peter J. Butler, New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

Plaintiff, Robert Booth, on his own behalf and on behalf of all others similarly situated, filed this individual and class action on August 8, 1975, alleging racial discrimination in the employment practices of the defendant, National American Bank. Plaintiff initially sued both the bank and the individual members of its Board of Directors, but the directors were dismissed by judgment of February 19, 1976. Plaintiff also initially alleged two causes of action, one under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter referred to as "Title VII"), and one under the Civil Rights Act of 1866, 42 U.S.C. § 1981. The § 1981 claim was dismissed on June 9, 1976, for prescription. Also on June 9, 1976, the class which plaintiff purported to represent was certified as being "All black persons who, since July 2, 1965, were employed by, applied for employment with, or are currently employed by, the National American Bank." In this posture the case went to trial on February 6, 7, 8, 12 and 22, 1979, on the issue of liability only. At the conclusion of the evidence, the Court gave the parties until March 7, 1979, to file supplemental briefs, at which time the matter was taken under submission.

Having thoroughly reviewed the evidence, the memoranda of counsel, and the applicable law, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.

The named plaintiff, Robert Booth, is a 1969 graduate of George Washington Carver High School, a public high school in New Orleans, Louisiana. After graduating from high school, Booth completed one semester at the University of New Orleans, where he received four "F's" and one "D," and was therefore placed on scholastic probation. (See, defendant's Exhibit No. 2). Booth therefore dropped out of the University of New Orleans ("UNO") and transferred in June of 1970 to Southern University in New Orleans ("SUNO"), where he received "C's" and "D's" through the Spring semester of 1971. (See, defendant's Exhibit No. 3.) Through August, 1971, Booth supported himself with part-time janitorial work. (See, defendant's Exhibit No. 4.) On October 21, 1971, Booth was employed by the defendant, National American Bank, as a full-time silver teller at a starting salary of $325.00 per month. While employed at the bank, Booth received two $25.00-per-month pay raises, thus receiving $375.00 per month when his employment was terminated on December 1, 1972.

2.

The defendant bank had hired Booth as a "silver teller" at its Lee Circle branch. The Lee Circle branch of the National American Bank was the coin depository for all of the bank's branches, and it was responsible for coin shipments not only to branch banks, but also to various customers. A "silver teller" is a bank employee with the responsibility of counting coins such as pennies, nickels, dimes, etc. into "tubes" of various dollar amounts per tube, and then of counting out bags of tubes in different denominations in order to fill the coin orders placed by customers, and to satisfy the coin requirements of the branch banks.

3.

When Booth was hired in October, 1971, he was trained as a silver teller by two bank employees, John Hebert and Joseph Danforth. After 2–3 weeks of training,

Booth became one-half of a silver teller "team" with John Hebert. Hebert was subsequently terminated by the bank and was replaced by Houston Bruce in May, 1972. Bruce and Booth, both black, then became the silver teller team for the Lee Circle branch, after Booth spent approximately two weeks training Bruce.

#### 4.

Soon after Bruce arrived, and during his training period, the team suffered a $500.00 shortage in its daily accounts. For a silver teller, a shortage occurs when more coin tubes than are necessary leave the bank in the coin bags which go to customers. Since it is often impossible to tell from the silver tellers' records which customer received the excess money (usually occurring through a miscounting of tubes while filling orders), the bank must rely on the honesty of its customers to report the excess and return it, in order to avoid a loss.[1]

#### 5.

The initial $500.00 shortage in May, 1972, was the result of the team's having miscounted the bags of money it was dealing with, and the money was located the following day at one of the branch banks. There were later shortages in small amounts of $4.00 or $5.00, but on December 1, 1972, the team experienced a second shortage of $500.00.

#### 6.

In 1972, Booth's supervisor at the Lee Circle Branch of the National American Bank was Warren Nardelle, Jr. At the time, Nardelle was an Assistant Vice-President of the bank, and the Branch Manager of the Lee Circle Branch. He testified that he discussed the May, 1972, shortage with Booth because a $500.00 shortage is a serious matter. With that first shortage the bank was lucky, because the money had gone to a branch bank, and was returned the next day. Even with the smaller shortages, Nardelle always spoke to Booth about them and stressed the importance of keeping in balance. Although Booth insisted on

direct examination that the first $500.00 shortage had not been discussed with him, he later admitted on cross-examination that his supervisor always said something to him when he was short. He further admitted that when he was out of balance, he was always "short" and never "over."

#### 7.

With respect to the second $500.00 shortage of December 1, 1972, Nardelle testified that the branch closed for business as usual at 2:30 p.m., after which the various tellers added up their balance sheets and Booth found that he and Bruce were short $500.00. Booth reported the shortage to Nardelle around 4:00 p. m., and Nardelle, along with five other tellers and the assistant manager, stayed on until almost 7:00 p. m. trying to locate the missing $500.00. It could not be accounted for. Nardelle therefore informed the Branch coordinator of the incident and a decision was made to fire both Bruce and Booth, since, as a team, they were both responsible for the loss. Nardelle called Booth into the conference room that same night and informed him of the decision, explaining to Booth that he was being fired for the occurrence of two serious shortages, and for no other reason. Several days later one of the bank's customers reported having received an extra $500.00 worth of coins, and the money was returned to the bank.

#### 8.

Nardelle testified that when Booth and Bruce were fired, they were replaced by a single white employee who was more efficient, as the bank was at that time "tightening its belt." However, Nardelle emphatically stated that at no time did he tell either Booth or Bruce that they were being terminated due to a cut-back in employees, or a "lay-off," nor that they would be re-hired at a later date. The white teller who replaced Booth and Bruce was later himself replaced, this time with a black employee. Nardelle testified that he was never inter-

---

1. Although a shortage could also occur through the accidental transfer of excess coin tubes to branch banks, these mistakes are necessarily easier to catch and correct since the branch which received the excess would immediately report it.

viewed by a representative of the E.E.O.C. regarding this incident. He also testified that a $500.00 shortage is a very serious matter, and that two such shortages within one year would be considered grounds for dismissal for either a white or a black employee. Booth offered no evidence that any white employee of the National American Bank who had had similar shortages was either not fired, or was rehired after termination.

### 9.

Booth testified that, although Nardelle may have chastised him regarding the two $500.00 shortages, he was never told by Nardelle that this was the reason he was being fired. Booth insisted that Nardelle told him, on December 1, 1972, that he was being terminated solely due to a "lay-off," or employee cut-back on the part of the bank, and that when things eased up economically, the bank would rehire him. Booth was never rehired by the bank, despite several inquiries on his part in that direction. Since Booth learned of his white replacement, he felt that he had been fired solely due to his race, i. e., black. Accordingly, Booth filed a charge of discrimination with the E.E.O.C. on January 15, 1973 (plaintiff's Exhibit No. 3), and received a "right to sue" letter on May 22, 1975 (plaintiff's Exhibit No. 5). The present lawsuit followed.[2]

### 10.

When Robert Booth originally filled out his application form for employment with the National American Bank, he received a telephone call from the bank in less than a month, asking him to come in for an interview and a polygraph test. He testified that within several days of taking the test, he was told that he could start working as a silver teller at the Lee Circle Branch. Booth stated that he was treated very courteously by the bank when he applied for the job, that he was treated by the bank just like any other applicant, white or black, and that he thought his salary at the bank was fair. He further testified that there was no failure on the bank's part to timely promote him, because he did not feel he should have been promoted. The only complaint he had against the bank was that he felt he was fired solely because of his race, and not because of poor job performance.

### 11.

When Robert Booth left the National American Bank in December, 1972, he was unemployed until February, 1973, when he was hired as a coin teller at the Federal Reserve Bank. Booth testified that he was laid off at the Federal Reserve Bank because work was slow, but on cross-examination he admitted that he had been terminated in December, 1973, for failure to pass a physical examination. Booth also filed a charge of discrimination with the E.E.O.C. for this termination, claiming that he was really let go solely due to his race.[3]

### 12.

With respect to the claims of the class against the National American Bank, Booth and the class he purports to represent, allege that the defendant has engaged, since 1965 to the present, in an "across-the-

---

**2.** Houston Bruce testified that he was also told that he was being terminated on December 1, 1972, due to a "lay-off," although, to his knowledge, no other bank employees were laid off. Bruce further testified that, although he was terminated after the second $500.00 shortage occurred, this was not the reason given to him for the action taken. Although Bruce made a statement to the E.E.O.C. to this effect, he filed no charges of discrimination with the E.E.O.C. concerning the event.

**3.** Before Booth was hired by the Federal Reserve Bank, he once again sought reemployment with the National American Bank through Rodney C. Brower, Jr., a Senior Vice-President, and Secretary to the Board in charge of personnel. Brower told Booth that he could not rehire him due to the nature of the reason for his termination, i. e., the $500.00 shortages, but that he would write Booth a letter of recommendation to the Federal Reserve Bank. Brower then testified that in recommending Booth to the Federal Reserve Bank, he was trying to help Booth out, to give him a chance, and that he, Brower, told the Federal Reserve Bank that Booth had left the National American Bank due to a "serious misunderstanding with Booth's supervisor" because, if he had told them about the $500.00 shortages, they would never have hired Booth.

board" pattern or practice of racial discrimination against black people with respect to its policies of hiring, firing, promotions, salaries, and general employment terms. Booth testified that he personally told his attorneys that he knew that the National American Bank discriminated against blacks in the areas of hiring, firing, promotions, salaries, and general employment terms. However, on cross-examination he admitted that, even though he may have told that to his attorneys before they drafted the complaint and filed this suit, in fact, he did *not* know of *any* other black employees who had ever been discriminated against in *any* way by the defendant *except* for himself and Houston Bruce with respect to their being fired. When faced with direct questioning on each individual area claimed to constitute a pattern or practice, Booth testified that he, in fact, personally knew of no one who had not been hired because he was black; of no one who had received a smaller salary because he was black; of no one who had not been promoted because he was black; and of no one who had in any way been treated unfairly by the defendant on account of their race. Although Booth testified that he felt the firing of both himself and Houston Bruce was on account of their race, he offered no evidence that the defendant had ever failed to terminate an employee with similar shortages, or that white employees were treated differently for similar infractions.

### 13.

Nevertheless, Booth, as a representative of the class, set forth to demonstrate, through the use of statistics and live testimony, that the defendant National American Bank had indeed engaged in the patterns and practices outlined above, allegedly violative of Title VII. In this regard, Booth and the class (hereinafter referred to as the "plaintiffs") introduced the testimony of Dr. Arnold Levine, whom the Court accepted as an expert in mathematics and statistics.

### 14.

Based on the testimony of Rodney C. Brower, Jr., Dr. Levine started his statistical analysis of the National American Bank's work force by focusing on the three basic categories into which the bank itself divided its employees, namely: (1) service, (2) clerical, and (3) executive. Brower had testified that "service" employees included porters, janitors, maids, messengers, elevator operators and chauffeurs. The term "clerical" included employees such as silver tellers, window tellers, secretaries, typists, data processors and keypunch operators. Upper level management from branch managers to senior vice-presidents fell within the term "executive." Brower testified that starting in approximately 1960, and continuing until 1970, the defendant used a simple written exam in its hiring process, but that the test was excluding too many black job applicants so its use was discontinued in 1970. The bank then sought prospective clerical employees of all races with only a minimum requirement of a high school education. However, Brower testified that different skills are required for the different clerical positions, and that to the extent one position requires more skill than another the new hiree in the more skilled job will receive a slightly higher salary. Also, within any one position, a new hiree with more training or prior experience may receive a slightly higher pay at hire than an employee with no experience whom the bank must train.

### 15.

Dr. Levine prepared an initial statistical analysis on the categories of service, clerical, and executive employees of the defendant, based on the personnel cards kept by the bank from 1965 to date, plus the annual EEO–1 reports which the defendant has filed with the E.E.O.C. since 1965, along with the 1970 census as reflected in Table 172, Occupation of the Experienced Labor Force, New Orleans, Louisiana, SMSA. This initial statistical analysis report was received in evidence as plaintiff's Exhibit No. 2.[4]

4. Although Dr. Levine's report also recognized the existence of 1975 and 1976 updates to the

1970 census, and the defendant, through its expert, Dr. Abbott, urged the acceptance of the

**644**

**16.**

According to the 1970 census, when considering the skills necessary for the tasks involved in either the service, clerical, or executive areas of defendant's business, the percentage of blacks in the New Orleans population who are qualified for service jobs is 50.3%; for clerical jobs, 15.4%; and for executive positions, 5.7%. (See Table 1 of Dr. Levine's report, plaintiff's Exhibit No. 2.) Using these figures, Dr. Levine computed, for the service and clerical areas only, the actual number of blacks employed at the National American Bank versus the expected number of blacks which should have been employed by defendant had defendant been hiring qualified blacks in proportion to their existence in the New Orleans population. (See Table 2 of plaintiff's Exhibit No. 2.) After computing these figures, Dr. Levine then calculated the number of standard deviations by which the actual numbers differed from the expected numbers, finding that for defendant's clerical employees, the standard deviations ranged from 2.16 to 7, and that for service employees the range was from a standard deviation of .942 to one of 4.2.[5]

**17.**

In Table 9 of his initial report, Dr. Levine analyzed the average pay at hire of all clerical employees hired by defendant in 1976 and found the distinctions between white and black pay to be statistically significant, using the Chi Square test, the T-test, and the Mann-Whitney test. Dr. Levine testified, however, that his statistical analysis of pay at hire does not account for any skill differences between individual clerical jobs, nor does it account for differences in skill or experience between individual employees which might affect pay at hire. To the contrary, Dr. Levine testified that his analysis assumes that all clerical positions require exactly the same skills and training, and that there is no reason why someone with prior clerical experience should get a higher salary than someone with absolutely no experience who must undergo on-the-job training.

**18.**

Finally, in Table 10 of the initial report, Dr. Levine analyzed the number of clerical employees who were either fired or who resigned from the bank's employ in 1976. In that year, 96 whites resigned, while 7 were dismissed; while 11 blacks resigned, and 4 blacks were dismissed. The number of black resignations was not found to be statistically significant. However, Dr. Levine concluded, through the use of the Chi Square test, that the rate at which black employees were being fired or dismissed was statistically significant, and thus, at least inferentially, race-dependent. Dr. Levine further testified that in making this analysis, he did not take into account the reasons for which the employees in question were fired. This is so, Dr. Levine stated, because as a statistician he is dealing strictly with numbers, and not with reasons for dismissal.

**19.**

Dr. Levine made no statistical conclusions on defendant's practices regarding the promotions of blacks, nor did he ultimately conclude that any racial discrimination was at play with respect to the service employees, or, for that matter, with respect to executive employees. Dr. Levine's statistical conclusions regarding defendant's employment practices were confined to the area of clerical employees. Those conclusions were that: (1) blacks were not proportionately represented in defendant's work force from 1966–1976; (2) blacks were discriminated against with respect to pay at hire in 1976; (3) blacks were fired more often than whites in 1976.

updates as the standard by which discrimination should be judged, due to the various inaccuracies and margins for error in the updates, as testified to at trial by both experts, the Court will accept as the proper standard for years 1965–1979, the 1970 census figures.

**5.** With respect to the statistics for service employees, the Court notes that the standard deviations exceeded three in only two years, namely 1975 and 1976. With respect to clerical employees, the number of standard deviations exceeded three in all years except 1976.

#### 20.

Plaintiffs next presented live testimony from five blacks who applied to the National American Bank for employment in 1974 and 1975 and were rejected. Iris Brisco, Ethel M. Ruffin, Dennis Anderson, Leah Atkinson, and Myra Lewis each submitted an application form to the bank, but never heard from the bank after that regarding employment. Each applicant had the required minimum high school degree, some had college experience, and some had prior experience either in sales or as a cashier. One applicant, Dennis Anderson, was a graduate of S.U.N.O. with a degree in Business Administration. He did not apply for a clerical position with the bank, but rather for a position as a loan officer. Anderson testified on cross-examination that he did not know what the term "officer" meant in the banking industry, and that he had no idea what the duties and responsibilities of a loan officer at a bank were.

#### 21.

In rebuttal to the plaintiffs' case, the defendant National American Bank presented evidence through Dr. David Clark, a psychologist and expert in diagnostic testing, that the level of education in the New Orleans area public schools is very low and that the average public high school graduate in this area has a reading level of only about the fifth grade, i. e., sufficient to read a newspaper. Dr. Clark further testified that just because a person is a high school graduate does not mean that he is equal in ability to all other high school graduates because the quality of New Orleans area schools varies so much, not only between public and private high schools, but also among the various public schools themselves.

#### 22.

Rodney C. Brower, Jr., a Senior Vice-President of the National American Bank, and the person in charge of personnel, then testified on the various employment policies of the defendant bank. After Title VII became effective in 1965, and at the urging of E.E.O.C. officials, the bank discontinued the use of any record-keeping process which recorded the race of an individual employee, or a job applicant. When the time came for submitting the annual EEO–1 report on the racial makeup of the bank's work force, the bank simply conducted a head count of whoever was employed the day before the report was due, filled in the appropriate numbers on the report, and sent it in.[6] In 1974, again at the request of an E.E.O.C. official, the defendant bank began keeping "informal" records of the race of its employees through the use of different colored blocks placed in a corner on each employee's personnel card. By reviewing these color-coded personnel cards one could thereby determine an entire range of statistics on the racial composition of the defendant's work force, including the number hired, fired, transferred and promoted each year.[7]

---

**6.** These EEO–1 reports were the support data for Dr. Levine's findings as to the "actual" number of blacks employed by the bank during the years 1966–1976. (See, Finding of Fact No. 16, supra.) Thus, the numbers found in Dr. Levine's report reflect only the number of blacks currently employed by the defendant on a given day in a given year, and do not show the total number of blacks who may have been hired that year.

**7.** When evidence of the color-coding system came to light at the trial of this matter, counsel for plaintiffs informed the Court that, although he had been granted full access to all personnel records of the bank for the years subsequent to 1974, he had never been informed of the private system in use regarding those records. Counsel for defendant stated that she had informed counsel for plaintiffs of this system over the telephone when the bank had produced the records. On cross-examination of Dr. Levine, co-counsel for defendant illustrated that Dr. Levine in fact had such information at his disposal, when counsel for defendant sought, through Table 9 of Dr. Levine's report, to have Dr. Levine compute the number of blacks hired by defendant in 1976 and Dr. Levine computed the figure of 17% of new hirees as being black. When questioned by counsel for defendant as to why he had not analyzed the percentage of blacks hired each year by the bank after 1974, instead of the number currently employed, Dr. Levine stated that he had not been asked to perform such an analysis by counsel for plaintiffs. See, *Hester v. Southern Railway Co.,* 497 F.2d 1374, 1381 (5th Cir. 1974), regarding a Title VII plaintiff's failure to properly use discovery in presenting statistical evidence.

**23.**

Brower further testified that in approximately 1960, the bank began using a simple written test to screen job applicants. By 1970 the test had been discontinued due to the inability of black applicants to pass the test. Since approximately 1973 the bank has had a hiring policy of affirmatively seeking black employees. The National American Bank actively seeks black job applicants from local business schools such as the Meadows Draughon Business School, which is predominantly black. The bank further has a policy of hiring marginally qualified blacks over qualified whites when job openings occur. Nevertheless, with respect to starting pay in clerical positions, the person who is more qualified, or who has more experience, will receive a slightly higher salary. Also, although marginally qualified people are actively hired, no one is retained by the bank who does not meet minimum performance standards. Lost or stolen checks, serious shortages, and excessive absenteeism are grounds for termination of any bank employee, white or black.

**24.**

With respect to Dr. Levine's initial statistical findings as reflected in plaintiffs' Exhibit No. 2, the defendant contends that the more accurate standard by which to judge its hiring practices is not the number of blacks currently employed on a given day of a given year, but rather, one should look at the number of blacks actually hired by the bank each year. When one looks at the number of blacks hired each year since 1974, the percentage of the bank's new employees who are black ranges from 15.7% to 22.4% for the years 1974 to 1978. (See, defendant's Exhibit No. 8.) These figures show that for the years 1974–1978 the defendant was hiring blacks well in excess of their representation in the New Orleans qualified clerical work force, which the Court has already accepted as being 15.4%. (See, Finding of Fact No. 15, fn. 4, supra.) Furthermore, with respect to the testimony of the five blacks who were rejected in the years 1974 and 1975, Brower testified that the bank had received many more job applications during those years than there were jobs available. In light of the large numbers of blacks actually being hired by the bank during 1974 and 1975, the live testimony at trial can hardly be considered corroborative of a statistical finding of discrimination.

**25.**

With respect to Dr. Levine's initial finding of statistical significance regarding the pay at hire of black clerical employees at the National American Bank in 1976, the defendant submitted evidence to show that, in fact, there were valid business reasons for the salaries assigned in that year, and that the distinctions made were not race-related. Specifically, the bank prepared a detailed summary, along with support data, for each full-time clerical employee hired in 1976. The summary included the background, skills, and prior experience of the hiree. (See, defendant's Exhibits Nos. 7 and 7a.) After thoroughly reviewing the summary, as well as a random sample of the support data, the Court finds that new hirees in 1976 were given starting salaries commensurate with their prior training and experience, and that no racial bias was exhibited by the defendant with respect to clerical pay at hire in that year.

**26.**

With respect to the last of Dr. Levine's initial findings, i. e., that in 1976 defendant fired blacks more often than whites, that finding was based on a sample for 1976 of only 11 dismissals, 4 of whom were black. (See, Table 10 of plaintiffs' Exhibit No. 2.) In connection with that finding, the defendant placed on the stand the immediate supervisors of each of the four blacks who were dismissed in 1976.

Herbert Hecker, the Branch Manager for the Lee Circle Branch in 1976, testified that silver tellers Michael Toussaint and Kevin Brown were fired for repeated failures to report imbalances in their coins, especially when such a failure occurred after Hecker deliberately placed an extra $10.00 in the team's coin allotment and the two employees failed to account for it.

Adele Keen was the manager of the Customer Relations Center of the defendant bank in 1976. She testified that Vanessa D. Johnson was fired after numerous customer complaints about her performance, coupled with an unexplained three-day absence from her job.

Anthony Chisesi was a Vice-President of defendant bank in 1976. He testified that Vernell Smith was fired for transferring $2,463.09 from a certificate of advice intended for the Federal Reserve Bank into his private checking account at the defendant bank.

The Court finds, based on the above testimony, that the defendant bank has articulated a valid business reason for each of the terminations in 1976, and that there was no racial discrimination involved in the firing of the above four black employees in 1976.

27.

In rebuttal to the expert testimony of Dr. Levine, defendant put Dr. James H. Abbott on the witness stand, who was also accepted by the Court as an expert in the fields of mathematics and statistics. Dr. Abbott prepared his own report, entitled "Check on Table 2—Office Jobs," which was admitted into evidence as defendant's Exhibit No. 12. In this report, Dr. Abbott made the same calculations as had Dr. Levine for the completed information of EEO–1 reports through the year 1978, and based on the same model as Dr. Levine had used, found the differences between the numbers of blacks actually employed and expected to be employed by the defendant to be statistically significant at greater than 2 standard deviations for all years except 1977 and 1978. However, Dr. Abbott further testified that it was his expert opinion that Dr. Levine had not used the correct statistical model in reaching the conclusions he did with respect to Table 2 of his report.

28.

Dr. Abbott was of the opinion that a statistical model which was not based on the numbers of black employees actually hired each year by a particular business would not accurately reflect or indicate the actual effort being made by the business in question to recruit and employ blacks in its work force. It was Dr. Abbott's expert opinion that the more correct model was one based strictly on the numbers of new hirees. If the percentage employed on a current basis varied too greatly from the percentage being hired, then one would have to look elsewhere, i. e., at termination and transfer data, to find the problem.[8]

In looking at the figures for new hirees for the years 1974 to 1978, Dr. Abbott's report reflects the same percentages as were found in defendant's Exhibit No. 8, namely that from 15.7% to 22.5% of all new hirees were black. On the basis of these figures, in Dr. Abbott's opinion, there is no ground for a finding of any statistical evidence of discrimination by the bank in its hiring practices.

29.

With respect to Dr. Levine's conclusions as to 1976 pay at hire for, and firing of, black clerical employees, Dr. Abbott testified that: (1) insofar as pay at hire was concerned, although the numbers may have statistical value, they do not account for any valid business reasons for the disparity such as the prior training and experience of a particular job applicant, and (2) insofar as Table 10 regarding terminations was concerned, a sample size of 11, with a cell size of only 4, was mathematically too small for the resulting statistical analysis to be valid.

30.

At this point, after a recess during which the plaintiffs' expert, Dr. Levine, was able to thoroughly review the enriched data for

---

8. For example, Dr. Abbott stated that Dr. Levine's report reflected that 7.9% of the total clerical work force of defendant bank was black in 1974, but that only 7.8% was black in 1975, thus evincing a .1% decrease in black employees from 1974 to 1975. However, Dr. Abbott pointed out that in 1974, 15.7% of all clerical hirees were black, and in 1975, 17% were black, thus implying a net gain in the work force's racial composition. Abbott testified that the actual loss versus the apparent gain could have been caused by any number of reasons, including blacks leaving the bank's employ who had been hired in prior years.

the years 1974 to 1978, plaintiffs offered into evidence three new statistical tables prepared by Dr. Levine, and admitted by the Court as plaintiffs' Exhibits Nos. 7 and 10. In Table A, Dr. Levine found that of the 1976 work force at defendant bank, 92% had been hired since 1965, but that 85% had been hired since 1970, with 81% being hired since 1972. Thus, the bulk of the defendant's hiring had occurred after 1970, and, considering the statistical faults flawing his previous analysis of the years 1966–1969, the crucial analysis for a correct picture of any alleged discriminatory practices on the part of defendant would be for the years 1974 to 1978.

In those years, Dr. Levine found the number of black terminations to be statistically significant for the years 1975, 1976, and 1978. (See, Table B, plaintiffs' Exhibit No. 7.) He did not feel that a sample size of 11 was too small to render the findings valid, and he still did not take into account the reasons for any of the terminations. With regard to pay at hire for black clerical employees, Dr. Levine found the disparities to be statistically significant, using the T-test, for the years 1975, 1977, and 1978, in addition to his earlier finding for 1976. (See, Table C, plaintiffs' Exhibit No. 10.) He continued to maintain that all clerical employees should receive the same pay at hire regardless of the skills required by a particular job, or possessed by a particular employee.

In rendering this second statistical analysis, Dr. Levine retracted from his original finding that blacks were disproportionately represented in defendant's clerical work force, and did not disagree that there was no statistical evidence of racial discrimination in hiring by the bank. However, he did conclude that for the years cited there was statistical evidence of racial discrimination in the pay at hire for black clerical employees, and in the termination of black clerical employees.

31.

In rebuttal to the second report and findings of Dr. Levine, the defendant submitted all application and employment cards for the years 1974, 1975, 1977 and 1978 with respect to pay at hire for clerical employees. Rodney Brower testified that the previous analysis regarding 1976 was indicative of the hiring policies behind pay decisions made in the other years. A random survey of the new data reflected that valid business reasons existed for all decisions made with respect to clerical pay at hire, and there was no showing of racial discrimination in this area for the years 1974, 1975, 1977 and 1978. (See, defendant's Exhibits Nos. 16B, 17B, 19B, and 20B).

32.

Brower then prepared a list of names of every black clerical employee terminated by the bank in the years 1974, 1975, 1977 and 1978, which list was admitted in evidence as defendant's Exhibit No. 21. The bank then called to the witness stand the immediate supervisors of each of the 28 black clerical employees who were terminated during those years, who testified as to the reasons for the terminations and the circumstances surrounding the dismissals of those employees. The evidence for each employee was that there existed a valid business reason for the termination, and that no racial discrimination was involved. However, plaintiffs were given a chance to rebut this testimony in order to show that the reasons stated by the witnesses were but a pretext for racial discrimination. In that regard, the Court recessed for five days so that plaintiffs would have a fair opportunity to marshal their resources for rebuttal.

33.

When the evidence recommenced, plaintiffs had only found two of the 28 former employees who contested the reasons given for their termination by the defendant. Gwendolyn Hymes, a former teller, had been fired for losing checks and failing to microfilm her transactions. Hymes testified by stipulation that, although she may have misplaced various checks and other items entrusted to her care, such occurrences were not uncommon among other bank employees. She further testified that all the checks which she had misplaced were either found or otherwise recovered by the bank after her termination.

In contrast, Hymes' supervisor, Jackie Lindelow, testified that the bank had received complaints from 14 customers that Hymes had failed to properly credit their Christmas savings accounts. When Lindelow went to Hymes' records to investigate the complaints, she found that Hymes had failed to microfilm any of the Christmas savings transactions, and that she was $500.00 short in her balancing.

### 34.

Pearlie Perrault was fired after it was determined that she had lied on her polygraph test. Perrault testified that she had been truthful in answering the questions on the test, but that about seven days after she had been working at the bank, a relative with whom she had had a family quarrel, called the bank out of vengeance and told the bank certain falsehoods about her past. To the contrary, defendant's Exhibit No. 22 shows that Perrault admitted on her interview only to a prior charge of shoplifting which was subsequently dismissed, but that the New Orleans Police Department records revealed that Perrault, who has an alias of "Pearlie Tyler," had also been arrested on four prior occasions for possession of stolen goods, shoplifting and assault, and that the prior charges were still pending as of the date of the interview on August 5, 1975.

### 35.

Based on the foregoing testimony, the Court finds as a matter of fact that there was a valid business reason for the terminations of each of the 28 black clerical employees dismissed by defendant since 1974, and further finds that, with respect to the terminations of Gwendolyn Hymes and Pearlie Perrault, the plaintiffs have failed to show that the stated reasons were merely pretexts for racial discrimination.

### CONCLUSIONS OF LAW

The Court has jurisdiction of this matter under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e), by virtue of plaintiff's having filed a complaint with the E.E.O.C., and having received a right to sue letter on May 22, 1975. See, *Green v. For-* *ney Engineering Co.,* 589 F.2d 243, 246 (5th Cir. 1979), and Finding of Fact No. 9, supra.

With respect to an individual claim for relief under Title VII, the United States Supreme Court has outlined the burden of proof in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must make out a prima facie case of discrimination by showing: (1) that he belongs to a racial minority; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. The burden then shifts to the defendant employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. In so stating the reason for the contested action, the employer must prove by a preponderance of the evidence that the alleged reason exists factually. *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1255 (5th Cir. 1977). However, he need not prove an absence of discriminatory motive, *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), for in that regard, the burden shifts back to the plaintiff to prove by a preponderance of competent evidence that the presumptively valid reasons stated by the defendant employer were in fact a pretext, or cover-up, for a racially discriminatory decision. *McDonnell Douglas Corp. v. Green,* supra, at 93 S.Ct. 1826; *Turner v. Texas Instruments, Inc.,* supra, at 555 F.2d 1255.

In the present suit, plaintiff Robert Booth alleges, with respect to his individual claim, that he was unlawfully discharged by the defendant, National American Bank, on account of his race, and not because of either a work force reduction or poor job performance on his part. To the extent that plaintiff has proven himself to be a member of a racial minority, i. e., a black, and to the extent that he has also proven that, although qualified to be a silver teller

at defendant bank, he was discharged on December 1, 1972, and replaced with a white employee, the Court finds that plaintiff has made out the necessary prima facie case of racial discrimination in employment practices against the defendant, National American Bank.

The defendant, however, has likewise met its burden of articulating a legitimate, non-discriminatory reason for Booth's termination through the testimony of Warren Nardelle concerning the occurrence of two $500.00 shortages during Booth's tenure. Although Booth insisted that Nardelle never told him that the shortages were the reason for his termination, the Court finds Nardelle's testimony to be the more credible of the two on that point. Even if, as Booth alleges and as Houston Bruce testified, Nardelle had informed both employees that they were being terminated due to a work force reduction, the Court feels that the replacement of two employees with only one employee, albeit a white, substantiates such a reason if stated. Nevertheless, the Court feels that the ultimate reason for both terminations was the occurrence of the second $500.00 shortage, and especially so in light of the fact that both were terminated immediately after the shortage occurred on December 1, 1972. In this regard, Booth failed to meet his burden of showing through competent evidence that the stated reason for his discharge, i. e., the $500.00 shortages, was but a pretext for the bank's discriminating against him on account of his race.

In *McDonnell Douglas Corporation v. Green*, supra, the Court was dealing with a former employee of the defendant corporation who, as a civil rights leader, had engaged in an illegal "stall-in," designed to tie up access to and egress from his former employer's plant at a peak traffic hour. Subsequent to this unlawful activity, the plaintiff sought to be rehired by the defendant and was denied employment on account of his participation in the "stall-in." Plaintiff alleged that the defendant had violated § 703(a)(1) of Title VII by discriminating against him on the basis of his civil rights activity. The Supreme Court held that there was no Title VII violation because an employer has a right not to hire anyone who engages in illegal conduct towards it, and thus, the defendant had stated a valid business reason for its actions. However, the court further stated that on remand, the plaintiff should be given a fair opportunity to show that the defendant's stated reason was but a pretext for racial discrimination. Although there were many potential ways for plaintiff to do this, the court stated at 93 S.Ct. 1825 that:

> Especially relevant to such a showing would be evidence that white employees involved in acts against [the employer] of comparable seriousness to the "stall-in" were nevertheless retained or rehired. [The employer] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

This standard under Title VII applies equally well to white employees who are fired for infractions for which blacks are retained. In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court stated at 96 S.Ct. 2580:

> . . . The Act prohibits *all* racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination. Indeed, the Title VII plaintiff in *McDonnell Douglas* had been convicted for a nontrivial offense against his former employer. It may be that theft of property entrusted to an employer for carriage is a more compelling basis for discharge than obstruction of an employer's traffic arteries, but this does not diminish the illogic in retaining guilty employees of one color while discharging those of another color. (Emphasis in original.)

In the present case, the defendant has not attempted to accuse the plaintiff of criminal activity against the bank, but merely

has stated the perfectly valid reason that a bank cannot afford to keep an employee who is responsible for multiple shortages in amounts as large as $500.00. Nevertheless, the *McDonnell* and *McDonald* decisions illustrate that a valid reason for termination must be applied equally to white and black employees. In this regard, plaintiff has not presented any competent evidence whatever that the defendant bank did not fire white employees who experienced similar shortages. Although *McDonnell* stresses the equal treatment proof of pretext, the entire context of a defendant's treatment of and attitude towards an individual employee can serve to show pretext. However, in the present case, plaintiff's testimony was that in every other respect than his termination, he was treated fairly and equally by the National American Bank. Booth was hired in less than a month of his application for the job, despite his having little or no job experience and a poor academic record. He received two raises within one year, and Rodney Brower made every effort to get him another job at the Federal Reserve Bank. Under the facts at hand, this Court has no choice but to find in favor of the defendant, National American Bank, and against the plaintiff, Robert Booth, on his individual claim, and to render judgment accordingly.

■ With respect to the claims of the class for which Robert Booth is the named representative, plaintiffs allege that the defendant National American Bank has engaged since 1965 in an unlawful pattern or practice of discrimination against blacks with regard to hiring, firing, pay at hire, promotion, and general employment terms.[9] In order to meet their burden of proof, plaintiffs must prove that there was a pattern or practice of disparate treatment of blacks by the defendant bank, and that the differences were "racially premised." *International Brotherhood of Teamsters v.*

*United States*, 431 U.S. 324, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977), citing *McDonnell Douglas Corp. v. Green*, supra. In making out such a prima facie case of discrimination, the plaintiffs must prove more than the mere occurrence of isolated, or "accidental," or sporadic discriminatory acts. They must establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure, i. e., the regular rather than the unusual practice. *Id.*, at 97 S.Ct. 1855.

■ Class action plaintiffs may, in certain cases, make out such a prima facie case solely through the use of statistical evidence. *Id.*, at 97 S.Ct. 1856, fn. 20. However, the court in *International Brotherhood of Teamsters v. United States* cautioned at 97 S.Ct. 1856–1857 that:

> . . . statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.

Thus, once a class action plaintiff has made out a prima facie case, he has raised only an inference of discrimination, and the employer must be given an opportunity to show that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1371 (5th Cir. 1974).

■ In the present case, the plaintiffs initially presented statistical evidence tending to show that the defendant National American Bank was not hiring blacks in proportion to their representation in the local qualified work force. This was achieved through a review of the defendant's personnel records and annual EEO–1 reports from 1965–1976. By comparing the

9. Although the named plaintiff, Robert Booth, has been found upon the trial of this matter to have no merit to his individual claim of racial discrimination in his being fired by defendant, he is still entitled to represent the class in an "across-the-board" employment discrimination suit since the class was certified prior to trial on the merits of his individual claim. *Franks v.*

*Bowman*, 424 U.S. 747, at 752–757, 96 S.Ct. 1251, 1258–1261, 47 L.Ed.2d 444; *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir. 1978). But cf. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); and *Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir., en banc, 1978).

actual number of black clerical employees employed each year versus the number one would expect from a local work force where 15.4% of the qualified clerical workers were black, the disparities in the defendant's work force were found to be statistically significant for most years in terms of the number of "standard deviations" found. (See, Finding of Fact, No. 16, supra.) Although the use of standard deviations to show statistical significance has been approved by the Supreme Court, there are many other factors regarding a particular statistical model which must be carefully analyzed before accepting the resulting conclusion. See, *Hazelwood School District v. United States*, supra, at 97 S.Ct. 2743, n. 17, citing *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

To begin with, although Dr. Levine constructed a table of standard deviations for clerical employees based on the number of black high school graduates in the New Orleans population (See, Table 4, plaintiff's Exhibit No. 2), the correct standard for comparison in the present case is the percentage of qualified black clerical workers in the New Orleans area, as reflected in Table 1 of plaintiff's Exhibit No. 2, and adopted by the Court in Finding of Fact No. 16, supra. The percentage of blacks in the New Orleans area with high school degrees is approximately 19%. However, the percentage of qualified black clerical workers is somewhat smaller, 15.4%. The 3.6% difference could be critical in achieving a valid statistical conclusion, and the law mandates that a defendant employer's work force be measured only against a pool of qualified job applicants, and not the general population. *Hazelwood School District v. United States*, ibid., at 97 S.Ct. 2742–2743; *James v. Wallace*, 533 F.2d 963 (5th Cir. 1976).

The next important consideration in computing a statistical analysis of an employer's hiring practices is to determine which "actual" numbers will be compared with the qualified population percentage. In *Hazelwood School District v. United States, supra*, the government contended that defendant employer had engaged in class-wide discrimination against blacks in its hiring of school teachers. Plaintiff attempted to prove its case through the use of statistical evidence which compared the number of black school teachers currently employed by the defendant school district in a given year to the number of available school teachers in the general population.[10] By making such a comparison, the government had the potential for a prima facie case of discrimination.[11] However, the court in *Hazelwood* reversed the Court of Appeals for concluding that such an analysis *conclusively* proved the plaintiff's case, by stating at 97 S.Ct. 2742 that:

> The Court of Appeals totally disregarded the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted by statistics dealing with Hazelwood's *hiring* after it became subject to Title VII. (Emphasis supplied.)

The Court noted that racial discrimination in employment was not made illegal until Title VII was enacted in 1965, and that

> . . . [An] . . . employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes. (ibid.)

Thus, the court recognized that, assuming an all-white work force in 1965, statistics based on those currently employed by a defendant, instead of those hired by a de-

---

**10.** With respect to the standard for comparison at issue in *Hazelwood*, the school district contended that the correct pool was qualified black school teachers in St. Louis County, where the school district was located. The government contended that the appropriate pool extended beyond the county to include all qualified black school teachers in St. Louis city. Since the trial court had erroneously compared defendant's black teaching staff to the number of black students in the district, instead of to the teacher population in the relevant labor market, 97 S.Ct. 2742, the court remanded the case with instructions for determination of whether the "relevant labor market" included St. Louis city, or should be confined to St. Louis County, 97 S.Ct. 2744.

**11.** See, fn. 10, supra.

fendant, might, in the early years, reveal standard deviations which falsely characterize the defendant's hiring practices as discriminatory. This is so because an employer is not required by Title VII to fire white employees to make room for blacks, but only to give black job applicants an equal opportunity for job openings as they occur.[12]

Thus, in the *Hazelwood* case, the school district in 1972–73 only employed 1.4% blacks on its teaching staff, whereas it had hired 3.5% blacks as new teachers. Depending on which potential teacher population was chosen on remand (See, fn. 10, supra), the school district could have successfully rebutted the government's prima facie case with its hiring data. *Hazelwood*, supra, at 97 S.Ct. 2743, n. 17.

Thus, in the present case, the number of standard deviations found for the actual number of black clerical employees currently employed by the defendant National American Bank, proves a prima facie case of racial discrimination in hiring. See, Findings of Fact, Nos. 16 and 19, supra. However, an analysis of the number of black clerical employees actually hired by the defendant on an annual basis shows that the defendant is actively hiring blacks in excess of their representation in the relevant work force. See, Findings of Fact, Nos. 24 and 28. Accordingly, the Court finds that although the plaintiffs may have made out a prima facie case of racial discrimination in the hiring of black clerical employees, the defendant has successfully rebutted that presumption, based on the authorities outlined above, and is therefore entitled to judgment in its favor.[13]

Insofar as the remaining claims of class-wide employment discrimination are concerned, the plaintiffs failed to make out a prima facie case except in the areas of pay at hire, and firing, of clerical employees. There was no evidence of discrimination in either promotions or general terms of employment for any of the bank's three segments of employees, i. e., service, clerical, and executive. Nor was there any evidence of discrimination with respect to either hiring, firing, or pay at hire for the bank's service and executive employees. However, to the extent that plaintiffs' expert, Dr. Levine, found statistically significant disparities in the pay at hire for black and white clerical employees, and in the rate at which black clerical employees are fired (See, Finding of Fact, No. 30), the Court will now address those issues.

The central focus of the inquiry for the Court is whether the defendant employer is treating some people less favorably than others because of their race, color, sex, or national origin. Thus, a prima facie case under *McDonnell Douglas Corp. v. Green*, supra, raises an *inference* discrimination only because one presumes that the acts in question, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Accordingly, statistics will not be controlling in the presence of a justified reason for the particular employment decision, and evidence

**12.** The Supreme Court has recently held that an employer under Title VII may even go so far, voluntarily, as to give job preference to blacks over whites, although it may not be compelled to do so. *United Steelworkers, Etc. v. Weber*, —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

**13.** Although statistical evidence alone may be enough to support a prima facie case, a Title VII plaintiff stands an even greater chance of conclusively proving discrimination when that evidence is buttressed with live testimony. *Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir. 1976), on remand 424 F.Supp. 1242; *Swint v. Pullman-Standard*, 539 F.2d 77 (5th Cir. 1976); *James v. Stockhold Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977), cert. den. 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781. However, the live testimony in the present case, which consisted only of five job applicants who never heard back from the defendant, hardly constitutes the proportions comparable to the 40 live witnesses presented in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843 (1977), nor did the content of their testimony bring "the cold numbers convincingly to life." 97 S.Ct. at 1856. Cf., *James v. Stockhold Valves & Fittings Co.*, supra. Thus the Court does not find that the live testimony presented at this trial successfully prevented effective rebuttal by the defendant of the plaintiffs' statistical evidence.

that the employees' qualifications were such that the Court can conclude that the decisions affecting them were free from racial motivation. *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978).

■ In the present case, Dr. Levine found the allocation of pay at hire for clerical employees to be statistically significant for the years 1975, 1976, 1977 and 1978, the inference being that the decisions made were race-dependent. (See, Findings of Fact Nos. 17 and 30.) However, Dr. Levine acknowledged that these statistics did not take into account the various skills required by a particular job, or possessed by a particular employee. When such distinctions are taken into account, and the Court considers such to be valid business considerations for a decision as to the starting salary of an employee, the Court finds that the defendant National American Bank has proven by a preponderance of the evidence that a valid business reason existed for the majority of the decisions made in 1975–1978. (See, Findings of Fact, Nos. 25 and 31.) The Court further finds that there was no evidence of unlawful racial motivation in defendant's employment decisions. (See, Finding of Fact No. 23.) Having successfully rebutted a prima facie case of discrimination in pay at hire for black clerical employees, the defendant is entitled to a judgment in its favor on this issue.

■ Dr. Levine also found to be statistically significant the rate at which black clerical employees are fired from the defendant bank, even though the defendant's expert, Dr. Abbott, found that the sample size in certain cases was too small to render a valid statistical analysis. (See, Findings of Fact, Nos. 18, 29 and 30.) Although the courts have recognized that a sample size that is too small may undercut the strength of a Title VII plaintiff's case,[14] assuming arguendo that the plaintiffs in this case have statistics valid enough to set forth a prima facie case of discrimination in firing, the Court finds that the defendant bank has successfully rebutted that showing by artic-

ulating a valid reason for the termination of each of the 28 black clerical employees fired during the years 1974–1978. (See, Findings of Fact, Nos. 26 and 32.) In the face of the reasons stated by the bank for the terminations, the plaintiffs were unable to present through live testimony any evidence whatever that the stated reasons were either untrue, or that they were merely a pretext for racial discrimination. (See, Findings of Fact, Nos. 33 and 34.) Accordingly, the Court finds that the defendant is entitled to a judgment in its favor on this issue as well.

IT IS THEREFORE ORDERED that JUDGMENT be entered in favor of the defendant, National American Bank, and against the plaintiffs, Robert Booth on his own behalf, and on behalf of all others similarly situated, DISMISSING plaintiff's suit with prejudice, at plaintiff's costs.

---

14. See, *Mayor v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1257 (5th Cir. 1977) and *Ochoa v. Monsanto Company*, 473 F.2d 318 (5th Cir. 1973).